# 24-598

*To Be Argued By:*
BRIAN MARC FELDMAN

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 24-598

◆◆◆

MOSAIC HEALTH, INC., CENTRAL VIRGINIA HEALTH SERVICES, INC.,
individually and on behalf of all those similarly situated,

*Plaintiffs-Appellants,*

—against—

SANOFI–AVENTIS U.S., LLC, ELI LILLY AND COMPANY, LILLY USA, LLC,
NOVO NORDISK INC., ASTRAZENECA PHARMACEUTICALS LP,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

BRIAN MARC FELDMAN
  *Counsel of Record*
SHEILA BAYNES
AURELIAN LAW PLLC
3445 Winton Place, Suite 228
Rochester, New York 14623
(585) 542-1200

ELLEN MERIWETHER
CAFFERTY CLOBES MERIWETHER
  & SPRENGEL LLP
135 South LaSalle Street
Chicago, Illinois 60603
(312) 782-4880

LAUREN R. MENDOLERA
HARTER SECREST & EMERY LLP
50 Fountain Plaza, Suite 1000
Buffalo, New York 14202
(716) 853-1616

*Attorneys for Plaintiffs-Appellants*

## TABLE OF CONTENTS

Table of Authorities ............................................................iv

Preliminary Statement .........................................................1

ARGUMENT ......................................................................2

POINT I—CONCERTED ACTION IS EASILY PLAUSIBLE.............2

   A. Defendants do not rebut powerful indicators of conspiracy. ......2

      1. Defendants remain silent on why they alone shattered
        the status quo in late 2020.......................................3

        a. There is a near-zero probability that Defendants
          acted independently when 1,000 firms refrained. .............3

        b. This scenario—breaking the status quo, rather than
          maintaining it—is the opposite of *Twombly*. .....................5

        c. Moreover, this scenario—four firms acting
          separately from a 1,000-firm industry—is the
          opposite of *Mayor & City Council of Baltimore*. ...............5

      2. Defendants offer no explanation for AstraZeneca's and
        Sanofi's "coincidences." .........................................6

        a. There is a near-zero chance Sanofi independently
          announced on a Monday what AstraZeneca privately
          conveyed the prior Friday...................................6

        b. Sanofi was not the "initial mover" as Defendants
          claim.......................................................8

        c. Defendants' joint action was not follow-the-leader
          competition. ................................................8

   B. Defendants pivot to unpled, immaterial allegations. ................9

1. Defendants invent facts to suggest every drug company would act alone to slash 340B discounts—although none did for a decade...............................................9

   a. Defendants rewrite the economics of 340B sales. .............9

   b. Defendants recast civil penalties as equivalent to the exclusion "death penalty."..........................................11

   c. Defendants never explain why no drug company dared to impose restrictions until Defendants did so......12

2. Defendants try to reframe their joint action—but data show Defendants together smashed the status quo. ...........13

   a. Eli Lilly did next to nothing alone; it waited to impose impactful restrictions in concert with other Defendants..........................................................................13

   b. In fact, no firm copied Defendants until after the government refrained from imposing exclusion. .............15

3. Defendants reframe their motive as ending "abuse" rather than profiting—but both are *per se* violations. .........16

C. Defendants fail to rebut that their conduct was parallel. ........17

1. Defendants' timing arguments misstate the facts, misread the law, and defy common sense. ..........................17

   a. Defendants stretch four months into nineteen...............17

   b. Four months fit comfortably within precedent...............20

   c. Staggering restraints made sense....................................21

2. Defendants' conduct arguments depart from precedent and are too narrowly focused................................................23

   a. Defendants misread and ignore precedent. ....................23

    b.  Defendants miss the forest of slashed discounts for the trees of individualized exceptions. .............................. 26

    c.  Defendants leveraged portfolio-wide gains using their joint chokehold on diabetes treatments. ................. 27

   3.  Defendants seek a roadmap for price-fixing. ......................... 28

D. Defendants fail to rebut each plus factor. .................................. 28

E. This Court should remand all claims, federal and state. .......... 31

POINT II—THE ANTITRUST LAWS APPLY TO DEFENDANTS' CONDUCT. .................................................................................. 31

A. *Astra* imposes no bar here. ....................................................... 31

B. Defendants' belated immunity defense lacks merit. ............... 33

POINT III—*ILLINOIS BRICK* PROVIDES NO ALTERNATIVE FOR AFFIRMANCE. ..................................................................... 35

A. There is no reason to reach this question on appeal ................ 35

B. *Illinois Brick* does not apply to losses that Defendants admit are not overcharges. ....................................................... 36

Conclusion .......................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson News, L.L.C. v. Am. Media, Inc.,*
680 F.3d 162 (2d Cir. 2012) .................................................. 8, 15, 20, 30

*Astra USA Inc. v. Santa Clara Cnty.,*
563 U.S. 110 (2011) ........................................................................ 31

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ...................................................................... 5, 30

*Blue Shield of Va. v. McCready,*
457 U.S. 465 (1982) ........................................................................ 37

*Burtch v. Milberg Factors, Inc.,*
662 F.3d 212 (3d Cir. 2011) ............................................................ 25

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.,*
92 F.4th 381 (2d Cir. 2024) ............................................................ 5

*Conboy v. AT&T Corp.,*
241 F.3d 242 (2d Cir. 2001) ............................................................ 32

*Credit Suisse Secs. (USA) LLC v. Billing,*
551 U.S. 264 (2007) .................................................................... 33, 34

*Drug Mart Pharm. Corp. v. Am. Home Prods. Corp.,*
93-cv-5148, 2002 WL 31528625 (E.D.N.Y. Aug. 21, 2002) ................. 37

*Elec. Trading Grp., LLC v. Bank of Am. Secs. LLC,*
588 F.3d 128 (2d Cir. 2009) ......................................................... 33, 34

*FTC v. Ind. Fed. of Dentists,*
476 U.S. 447 (1986) ........................................................................ 17

*Gordon v. NYSE,*
422 U.S. 659 (1975) ........................................................................ 34

iv

*Hinds Cnty. v. Wachovia Bank N.A.*,
    700 F. Supp. 2d 378 (S.D.N.Y. 2010) ................................................... 35

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005) ................................................................. 36

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ............................................................................ 35

*In re Anderson*,
    884 F.3d 382 (2d Cir. 2018) ................................................................. 33

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    123 F.3d 599 (7th Cir. 1997) ........................................................ 36, 37

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016) ....................................................... 24

*In re DRAM Indirect Purchaser Antitrust Litig.*,
    28 F.4th 42 (9th Cir. 2022) ................................................................... 8

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ................................................................... 30

*In re Interest Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017) ................................................. 25

*In re W. States Wholesale Nat'l Gas Antitrust Litig.*,
    661 F. Supp. 2d 1172 (D. Nev. 2009) ................................................. 35

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
    146 F.3d 66 (2d Cir. 1998) ................................................................... 16

*Kansas v. UtiliCorp United, Inc.*,
    497 U.S. 199 (1990) ............................................................................ 36

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ....................................................... 5, 6, 13

*McCarthy v. Recordex Serv., Inc.*,
    80 F.3d 842 (3d Cir. 1996) ................................................................. 35

*Modern Home Inst., Inc. v. Hartford Accident & Indemnification Co.*,
513 F.2d 102 (2d Cir. 1975) ................................................................ 20

*New York v. Hendrickson Bros., Inc.*,
840 F.2d 1065 (2d Cir. 1988) ............................................................. 22

*Norman v. Niagara Mohawk Power Corp.*,
873 F.2d 634 (2d Cir. 1989) ............................................................... 32

*Nw. Oil Co. v. Socony-Vacuum Oil Co.*,
138 F.2d 967 (7th Cir. 1943) ............................................................. 27

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024) .......................................................... 16

*Otter Tail Power Co. v. United States*,
410 U.S. 366 (1973) ........................................................................... 34

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) ............................................................. 25

*Ross v. Am. Express Co.*,
35 F. Supp. 3d 407 (S.D.N.Y. 2014) .............................................. 21, 23

*Schenker AG v. Société Air France*,
102 F. Supp. 3d 418 (E.D.N.Y. 2015) ................................................ 22

*Schonfeld v. Hillard*,
218 F.3d 164 (2d Cir. 2000) ............................................................... 35

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) .......................................................... 22, 25

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010) ............................................................... 30

*Strobl v. N.Y. Mercantile Exch.*,
768 F.2d 22 (2d Cir. 1985) ................................................................. 34

*Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*,
902 F.3d 735 (7th Cir. 2018) ............................................................. 35

*Twombly v. Bell Atl. Corp.,*
  425 F.3d 99 (2d Cir. 2005) ....................................................................24

*United States v. NASD,*
  422 U.S. 694 (1975) .....................................................................33, 34

*Verizon Commc'ns Inc. v. Law Office of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004) .............................................................................32

*Warmenhoven v. NetApp, Inc.,*
  13 F.4th 717 (9th Cir. 2021) ................................................................31

**Rules**

Fed. R. App. P. 3..................................................................................31

**Regulations**

42 C.F.R. § 10.11 ...................................................................................12

82 Fed. Reg. 1210 (Jan. 5, 2017) ...........................................................10

## Preliminary Statement

Defendants ask this Court to believe that a series of astonishing "coincidences" are plausible but that the simplest explanation is not. Alone among a thousand firms, Defendants—the four firms with full control over critical diabetes treatments—shattered the status quo to slash 340B discounts. Sanofi revealed its restrictions just one business day after AstraZeneca *privately* communicated similar restrictions of its own, and set them to go into effect on the same date. Every drugmaker apart from Defendants waited until the catastrophic government sanction of exclusion came off the table before daring to follow suit.

Defendants chalk this all up to a "handful of . . . coincidences." But Defendants' collective action protected them from the nuclear option of exclusion because the government could not exclude all four Defendants without stripping treatment from diabetes patients. And at the very point they implemented restrictions, Defendants were in discussions with shared lobbyists about their 340B strategy. The complaint alleges the obvious explanation—that Defendants worked together to pull this off. That is more than plausible.

Defendants smuggle in alternative facts, but doing so cannot, and does not, make Plaintiffs' conspiracy allegations implausible. And if four competitors could agree to decimate decade-long discounting practices (a *per se* antitrust violation) yet avoid suit by staggering precisely when and how they did so, private enforcement of the antitrust laws would be toothless. Precedent does not permit such an outcome. *Infra* I. Nor did Congress repeal the antitrust laws to let drugmakers collude to restrict drug discounts. *Infra* II. And there is no reason to consider a damages issue not addressed below that cannot resolve this appeal. *Infra* III.

This Court should reverse and instruct the district court to grant leave for Plaintiffs to proceed on their Second Amended Complaint.

## **A R G U M E N T**

## **POINT I**

### **CONCERTED ACTION IS EASILY PLAUSIBLE.**

## **A. Defendants do not rebut powerful indicators of conspiracy.**

Defendants sidestep the most prominent allegations in this case: (i) that they alone broke a decade-long status quo in late 2020, and (ii) that Sanofi announced its unprecedented and dramatic measures one business day after a private letter by AstraZeneca to its regulator

2

disclosing such measures scheduled to start the very same day. These unrebutted facts place Defendants' actions well beyond suspicious and make conspiracy plausible.

### 1. Defendants remain silent on why they alone shattered the status quo in late 2020.

### a. There is a near-zero probability that Defendants acted independently when 1,000 firms refrained.

Defendants, the only four firms (in a 1,000-strong industry) that control lucrative diabetes treatments, claim they acted independently in imposing unprecedented 340B restrictions when no other firm did so. That is not merely improbable: It's almost impossible.

Defendants admit they were horizontal competitors with exclusive control over three multi-billion-dollar diabetes treatment markets. (*Compare* Blue Br. at 3, 11–12, 73, *with* Red Br. at 31.[1]) They admit that 1,000 drug companies participate in the 340B program. (*Compare* Blue Br. at 25, *with* Red Br. at 34–35.) They admit that the entire industry lobbied against 340B contract pharmacy rules, just as Defendants did. (*Compare* Blue Br. at 24, *with* Red Br. at 12.) They

---

[1] "Blue Br." refers to the Brief for Plaintiffs-Appellants; "Red Br." refers to the Joint Brief of Defendants-Appellants; and "Green Br." refers to the *Amicus Curiae* Brief of the American Antitrust Institute in Support of Plaintiffs-Appellants.

admit that an undisturbed status quo persisted from 2010 until 2020, with *no* manufacturers imposing 340B restrictions. (*Compare* Blue Br. at 16, 26, *with* Red Br. at 9–10, 61.) And they admit that they imposed restrictions in 2020. (*Compare* Blue Br. at 18–25, *with* Red Br. at 49.) Yet no other firm imposed similar 340B restrictions until August 2021 (JA-822 (¶159))—only after the government set the precedent of *not* seeking to exclude Defendants (Blue Br. at 27).[2] When Defendants imposed their unprecedented restrictions, every other firm among 1,000 watched and waited. (*Id.* at 26.)

This could hardly be coincidence. The chances that, among 1,000 340B drug companies, the only four movers would randomly be the four competitors in these diabetes markets is a mathematical probability of $(^4/_{1000})(^3/_{999})(^2/_{998})(^1/_{997})$ or a 0.0000000024% chance. This was the Blue Brief's opening point. (*Id.* at 3.) Yet Defendants offer no explanation.

---

[2] Defendants wordsmith to assert that "in 2020, Merck and Novartis implemented their own policies" and that "United Therapeutics announced another." (Red Br. at 63.) In truth, while "Merck and Novartis . . . asked covered entities" to provide data, neither "cut off Contract Pharmacy 340B Drug Discounts for [those] unwilling." (JA-822 (¶159).) And the "much smaller drug company, United Therapeutics, announced plans" but did "not implement[] that policy." (*Id.*)

4

### b. This scenario—breaking the status quo, rather than maintaining it—is the opposite of *Twombly*.

The facts here are the very opposite of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). There, competitors were accused of conspiring to *maintain* the status quo by "sitting tight." *Id.* at 568. By contrast, Defendants here *changed* the status quo, imposing "complex and historically unprecedented changes in pricing structure." *Id.* at 556 n.4. That is a hallmark of conspiracy.

### c. Moreover, this scenario—four firms acting separately from a 1,000-firm industry—is the opposite of *Mayor & City Council of Baltimore*.

These facts are also the opposite of *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129 (2d Cir. 2013). There, this Court found a dozen broker-dealers' actions unremarkable because they reacted the same way as the entire industry: an "*en masse* flight from a collapsing market." *Id.* at 138; *accord City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Secs. Corp.*, 92 F.4th 381, 412–13 (2d Cir. 2024) (finding "unremarkable that a group of the world's largest banks" all had identical responses).

By contrast, when Defendants imposed their restraints, 99.6% of the 340B drug industry did not. Defendants' approach was clearly not

"the *only* rational business decision" as in *Mayor & City Council of Baltimore*, 709 F.3d 138. Defendants do not explain why they acted one way, and the rest of industry acted another.

### 2. Defendants offer no explanation for AstraZeneca's and Sanofi's "coincidences."

Defendants also fail to explain how Sanofi and AstraZeneca "announce[d] their unprecedented restrictions with a mere weekend between them, and both starting on the same day of October 1, 2020, without advance coordination." (Blue Br. at 23.)

### a. There is a near-zero chance Sanofi independently announced on a Monday what AstraZeneca privately conveyed the prior Friday.

This sequence arose in July 2020, when no firm had ever imposed impactful 340B restrictions. (*Id.* at 18, 23–25.) (Eli Lilly imposed a minor restriction in May 2020, but it had *no* discernible impact. *Infra* I.B.2.a.) The mammoth restrictions announced in July 2020 decreased Sanofi's discounting by 90% and AstraZeneca's by 85%. (*Id.* at 18, 23–25.)

Sanofi was the first to publicly announce such drastic measures, and it did so on Monday, July 27, 2020, with restrictions beginning on October 1, 2020. (*Compare* Blue Br. at 18–19, *with* Red Br. at 16.)

6

There is no dispute that on Friday, July 24, 2020, just one business day prior to Sanofi's announcement, AstraZeneca delivered a private letter to its regulator stating that it would impose similarly impactful restrictions also starting October 1, 2020. (*Compare* Blue Br. at 19, 21–22, *with* Red Br. at 15–16.) There is also no dispute that, absent collusion, "Sanofi should not have known about AstraZeneca's private Friday letter," "as that letter was not public." (Blue Br. at 22–23.)

Defendants admit that this was "particularly close-in-time." (Red Br. at 51.) But, in their telling, it was mere synchronicity. (*Id.*) While Defendants note both firms acted after the Executive Order (*id.*), they never explain why only these two firms would have reacted so quickly or how AstraZeneca's same-day reaction is plausible (*id*). And, as to their identical October 1 start date, they offer only that it was "the first day of the next fiscal quarter" (*id.* at 16), an explanation not given at the time. (JA-196–99, 206.)

This powerful evidence cannot be waved away as a "handful of supposed coincidences." (Red Br. at 51.)

7

### b. Sanofi was not the "initial mover" as Defendants claim.

At most, Defendants suggest this "sequence of alleged events" shows "there was an initial mover, followed by subsequent actors." (*Id.* at 4.) But the actual sequence sinks that explanation.

The private AstraZeneca letter came first. So, AstraZeneca was *not* following Sanofi's lead. While Sanofi's letter came second, "Sanofi should not have known about" AstraZeneca's private move. (Blue Br. at 22–23.) As Defendants concede, a "private communication[] with an agency [is not] equivalent to a public announcement." (Red Br. at 51.) Sanofi could only "follow" AstraZeneca if it had advance knowledge of AstraZeneca's plans. Defendants do not contest that such knowledge indicates "advance agreement." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012) (Blue Br. at 59–60).

### c. Defendants' joint action was not follow-the-leader competition.

This sequence does not fit within the "'follow the leader' theory of conscious parallelism," where competitors might independently decide "to follow [a] market leader." *In re DRAM Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 48 (9th Cir. 2022). That leaves collusion as the most obvious explanation. (JA-864–65.)

8

**B.     Defendants pivot to unpled, immaterial allegations.**

Defendants change the conversation by advancing a series of alternative facts without justification, but such assertions are impermissible on a motion to dismiss and, in any event, are both unsubstantiated and immaterial.  (Red Br. at 7 n.1.)

> **1.  Defendants invent facts to suggest every drug company would act alone to slash 340B discounts—although none did for a decade.**

Defendants downplay the regulatory and market forces that kept the status quo in place for over a decade by insisting that every drug company had sufficient reason to restrict 340B sales at community pharmacies.  (*Id.* at 34–40.)  Their story is incompatible with the pleadings, however, and runs headlong into an insurmountable problem—no firm did so for a decade.

> **a.  Defendants rewrite the economics of 340B sales.**

Defendants posit that drugmakers never worried about losing 340B market share because 340B sales are "unprofitable" and generate "significant financial losses."  (*Id.* at 38.)  But, as the complaint explains, even though undiscounted sales would be *more* profitable (JA-856 (¶301)), drugmakers were keen to avoid ceding 340B sales to competitors (e.g., JA-773–74 (¶1), JA-777 (¶7)), in part because of "the

9

immediate . . . loss of profits relating to those sales" (JA-806 (¶112)).

Defendants cherry-pick "penny-pricing" as purportedly emblematic of

the 340B discounted market segment. (Red Br. at 3, 7, 24, 35, 38, 39,

46, 62, and 66.) But they omit any data on the incidence and extent of

such pricing. Nor do they disclose that it is the "manufacturer [who]

controls when a product reaches [penny pricing] *through its own pricing*

*decisions*." 82 Fed. Reg. 1210, 1215–16 (Jan. 5, 2017) (emphasis added).

Their claim of 340B net losses is *ipse dixit*.

Moreover, Defendants elide the allegation that 340B sales create

positive spillover effects on non-340B sales. (Red Br. at 24.) They

pretend the complaint does not "elaborate on whether and how" that

happens. (*Id*. at 24.) But the very paragraph they cite explains how a

prescriber favoring 340B-discounted drugs is likely to choose those

drugs for "a patient receiving care outside the scope of a [340B] grant"

and "patients who fill their prescriptions at pharmacies that are not

participating" in 340B. (A-796 (¶70).) Defendants themselves admit

prescribers will often not be aware of "whether the individual to whom

they are prescribing a medication would qualify as a 340B patient."

(Red Br. at 38.) Preferences for drugs being offered at discounts can thus spill over into non-340B sales. (A-796 (¶70).)

Defendants also ignore allegations that they cared about their *overall* shares of these multi-billion-dollar drug markets. (JA-805 (¶¶109–12).) 340B sales prop up that overall share. And Defendants touted their overall shares to investors. (JA-805 (¶¶109–12).)

### b. Defendants recast civil penalties as equivalent to the exclusion "death penalty."

Defendants strain further to recast civil fines as "catastrophic penalties" (Red Br. at 41) and "crippling civil monetary penalties" (*id*. at 66).

They do this because they are stuck admitting that drugmakers feared being sanctioned with catastrophic federal healthcare program exclusion if they imposed drastic 340B measures. (*Compare* Blue Br. at 64, *with* Red Br. at 41; JA-854–56 (¶¶291–98); JA-797 (¶75).) Eli Lilly admitted exclusion would be "the economic equivalent of the *death penalty*." (JA-468 (emphasis added).) This fear kept drugmakers from imposing significant restrictions prior to Defendants' conspiracy (JA-796–97 (¶¶72–76)), and only Defendants' control over key diabetes medications neutralized that threat, emboldening them to conspire (JA-

11

857–58 (¶¶304–09)). Exclusion came off the table in May 2021, when regulators decided to respond to Defendants' unprecedented restrictions by threatening only civil monetary penalties, not exclusion. (Blue Br. at 27.) Defendants seek to minimize this development by arguing that penalties were just as bad as exclusion. (Red Br. at 41.)

But these sanctions are worlds apart. Civil monetary penalties are not the death penalty, particularly to multi-billion-dollar drug companies. Moreover, each Defendant has advanced purportedly full defenses to civil penalties that would not apply to exclusion. Penalties apply only to 340B "overcharging," 42 C.F.R. § 10.11(a)–(b), and each Defendant claims it does not "overcharge" because it does not offer 340B drugs at community pharmacies at all. (JA-584, 628, 672, 749). *See also infra* III.B. Defendants falsely equate civil penalties with exclusion—the only "crippling" sanction pled. (JA-797 (¶¶74, 77), 855 (¶¶291–92).)

### c. Defendants never explain why no drug company dared to impose restrictions until Defendants did so.

Even on Defendants' own terms, Plaintiffs do not just "hypothesize that Defendants were somehow not individually motivated" to impose

drastic 340B restrictions. (Red Br. at 3.) That is the undisputed track record of 1,000 drug companies over a decade.

It cannot be *implausible* to allege sophisticated drug companies actually understood their self-interest in choosing to maintain the status quo. During that decade (and since), they never made the type of "*en masse* flight from" 340B contract pharmacies that would support Defendants' claim that *not* imposing drastic restrictions was irrational. *Mayor & City Council of Baltimore*, 709 F.3d at 138. The allegations Defendants smuggle in run into this hard truth.

### 2. Defendants try to reframe their joint action—but data show Defendants together smashed the status quo.

Defendants admit their policies had the common effect of ending "the overwhelming majority of [their] Contract Pharmacy 340B Drug Discount sales to covered entities." (Red Br. at 45.) Data show they decimated 340B discounts in parallel. *Infra* I.C.1.a. Yet Defendants try to rewrite who broke the status quo and when.

### a. Eli Lilly did next to nothing alone; it waited to impose impactful restrictions in concert with other Defendants.

First, Defendants backdate the discount-slashing challenged in the complaint to Eli Lilly's actions in May 2020. (*Id*. at 39–40.) But the

13

May 2020 restriction was radically different than the later-imposed restrictions of September 2020. In May, Eli Lilly restricted 340B contract pharmacy discounts for formulations of a single drug, Cialis. (JA-816 (¶139).) This restriction was indeed unprecedented but a *very* light touch. As the complaint shows, it had no discernible impact on Eli Lilly's overall 340B sales and discounting levels, which actually *increased.* (JA-833–34.) By contrast, Eli Lilly's September restrictions led to an immediate "nosedive" (JA-836 (¶207)), flattening 340B discounting by 95% within two months (JA-834 (¶199)). Plaintiffs challenge what only the September restrictions achieved—"dramatically decreasing the sale of [Defendants'] drug inventory at discounts" (JA-775 (¶4)) by "eliminating the overwhelming majority of Contract Pharmacy 340B Drug Discounts," (JA-778 (¶9); JA-850 (¶275); JA-867 (¶350)).

Eli Lilly waited to attempt the challenged conspiracy (the one that reduced its discounting by 95%) until "it could ensure that the other Defendants would also do so." (JA-859–60 (¶318).) Its restrictions in May did not register as a blip on the company's overall discounts (JA-833–34), and presented no realistic threat of the disproportional "death

14

penalty" of exclusion.[3]  Eli Lilly's earlier narrow exception showed that, while "Eli Lilly had considered" broad restrictions in May 2020, it had "decided against" any until it reached an agreement with the other Defendants.  (JA-821–22 (¶157).)

Defendants counter that Eli Lilly's minor restriction proves it was willing to impose unprecedented restrictions alone.  But Defendants cannot explain why Eli Lilly did not adopt the *broad* restrictions on its own, and Plaintiffs—not Defendants—are entitled to every reasonable inference.  *See Anderson News*, 680 F.3d at 184–85.

### b.  In fact, no firm copied Defendants until after the government refrained from imposing exclusion.

Defendants then assert without citation that "[b]y 2024, more than 30 manufacturers" adopted similar 340B restrictions.  (Red Br. at 2, 14.)  But that allegation is not in the complaint, and it is immaterial.

Defendants do not dispute that no other firm stuck its neck out to impose such restrictions for "more than a year after Defendants announced their restrictions."  (JA-822 (¶160); Blue Br. at 27.)  *See also*

---

[3] HHS has not imposed exclusion for other narrow violations.  *See, e.g.*, HRSA, "FY 2024 Manufacturer Audit Results," https://www.hrsa.gov/opa/program-integrity/fy-24-manufacturer-audit-results (last visited Sept. 22, 2024).

*supra* 4 n.2.  Every other firm waited until after May 2021, when the government set a precedent that it would not seek exclusion; only then did they begin imposing similar restrictions.  (Blue Br. at 27.)   The industry's reluctance reinforces how much drugmakers feared exclusion and how Defendants uniquely leveraged control of diabetes drugs to avoid it.

### 3. Defendants reframe their motive as ending "abuse" rather than profiting—but both are *per se* violations.

Finally, Defendants recycle industry talking points of "abuses" in the 340B program.  (*Compare* Red Br. at 1–2, 8–12, *with* PhRMA, "340B," https://phrma.org/en/policy-issues/340B (last accessed Sept. 21, 2024)).  These are bold charges, given Defendants' massive profits at the expense of safety-net providers and needy patients.  They are neither alleged nor fair.[4]  *See* HRSA, "Program Integrity: FY24 Audit Results," https://www.hrsa.gov/opa/program-integrity/fy-24-audit-results ("no adverse findings" in 46 of 63 audits) (last viewed Sept. 25,

---

[4] Defendants cite fellow drugmakers' allegations as recounted in a judicial opinion, but they were never adopted as true. (Red Br. at 8–11, 45, 61.)  *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 455, 458 (D.C. Cir. 2024).  Regardless, this Court may not consider them.  *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70–71 (2d Cir. 1998).

2024). Nor did such "program integrity" concerns impel drugmakers to slash discounts for a decade.

They are also legally irrelevant. Defendants do not dispute that "competitors cannot collude even to prevent others from violating the law." (Blue Br. at 75.) The fact "[t]hat a particular practice may be unlawful is not, in itself, a sufficient justification for collusion among competitors to prevent it." *FTC v. Ind. Fed. of Dentists*, 476 U.S. 447, 465 (1986). PhRMA's cry of "abuse" provides no defense.

## C. Defendants fail to rebut that their conduct was parallel.

### 1. Defendants' timing arguments misstate the facts, misread the law, and defy common sense.

#### a. Defendants stretch four months into nineteen.

Defendants rewrite the complaint to claim that they "instituted the challenged policies over a period of *19 months*." (Red Br. at 3, 49–50, 54–55.) In their motion, they said seven months. *See* Defs.' Mem. at 24, Dkt. 47-1, 6:21-6507 (W.D.N.Y. filed Nov. 12, 2021). At oral argument, that ballooned to eighteen months. (JA-953.) Now, Defendants say nineteen months. (Red Br. at 3.)

The complaint says four months. It alleges Defendants announced the challenged restrictions—the dramatic new policies that immediately

17

eliminated most of Defendants' 340B community pharmacy discounts—between July 24, 2020, and December 1, 2020. (JA-813–16.) That is four months and seven days. Defendants imposed those challenged restrictions between September 1, 2020, and January 1, 2021. (*Id.*) That is exactly four months. Each Defendant achieved a massive slashing of 340B discounts within that same four-month period, as the complaint starkly illustrated:

- September 1 for Eli Lilly (JA-834):



- October 1 for Sanofi (JA-829):



- October 1 for AstraZeneca (JA-843):



- January 1 for Novo Nordisk (JA-840):



Despite this easily-defined four-month period, Defendants stretch to nineteen months by including extraneous events. But no Defendant (neither Eli Lilly nor any other) saw *any* impact before September 1, 2020. (JA-834.) *See supra* I.B.2. And *every* Defendant achieved dramatic reductions by January 1, 2021. (*See* JA-829, 834, 840, 843.) Their moves to slash 340B discounts were thus made and completed within four months.[5]

---

[5] No other 340B industry participant achieved or attempted any similar discount slashing until much later. (JA-822 (¶160); Blue Br. at 27.)

19

Defendants offer no authority for their inflated timeline, which encompasses "minor changes to [Defendants'] exceptions," made "while maintaining their common approach of refusing to offer Contract Pharmacy 340B Drug Discounts for the overwhelming majority of potential Contract Pharmacy sales." (JA-817 (¶141); Red Br. at 49–50.) They cite no law measuring parallel conduct by how long the conspiracy persists (Red Br. at 49–50), rather than when the parallel moves were made. This Court's unrebutted authority teaches that the focus must be on the "*key* parallel conduct" imposing the challenged restraint. *Anderson News*, 680 F.3d at 191. Here, that was "elimination of the bulk of [Defendants'] Contract Pharmacy 340B Drug sales." (JA-827 (¶177).) Defendants did that in four months.

### b. Four months fit comfortably within precedent.

Four months is easily short enough for conduct to be parallel. That is the lesson of *Modern Home Institute, Inc. v. Hartford Accident & Indemnification Co.*, 513 F.2d 102, 105–108, 110 (2d Cir. 1975), which Defendants never address. There, this Court determined that four competitors' actions over several months—from mid-April to mid-July— was "parallel conduct." (Blue Br. at 53.) So too here.

Indeed, parallel conduct can develop over years. Defendants focus on *Ross v. American Express Co.*, 35 F. Supp. 3d 407 (S.D.N.Y. 2014), where competitors engaged in "parallel conduct" when they adopted restraints (arbitration clauses) over four-and-a-half years. (Red Br. at 54–56.) Defendants claim that, in *Ross*, "all but one defendant 'implemented [the challenged restraint] within a month' of a group meeting."[6] (*Id.* at 55.) But the same is true here: All Defendants but one implemented the challenged restraints within a month (September 1 to October 1), and all but one announced those restraints within less than a month (late July to mid-August). (JA-813–16.) Better still, that one Defendant slashed discounting just three to four *months* apart from the others, not "more than a year" as in *Ross*. 35 F. Supp. 3d at 439.

The timeline here fits within precedent. (Blue Br. at 44–53.)

### c. Staggering restraints made sense.

Defendants also argue that a "lengthy time period in this case makes [no] sense." (Red Br. at 56.) But they ignore how antitrust conspiracies work and how slowly drug prescriptions change.

---

[6] In fact, there were 28 meetings over four years, and the defendants adopted clauses throughout that multi-*year* period. *See id.* at 439.

21

Antitrust conspiracies are illegal. Sophisticated conspirators readily appreciate that identical timing raises red flags. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 428 (4th Cir. 2015). Price-fixing conspiracies are, by their nature, "self-concealing." *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083–84 (2d Cir. 1988). One way to "avoid detection" is for conspirators to "stagger[] pricing changes to mask their . . . coordination." *Schenker AG v. Société Air France*, 102 F. Supp. 3d 418, 425 (E.D.N.Y. 2015). The complaint alleges just that, detailing how two Defendants (AstraZeneca and Eli Lilly) waited weeks to announce restraints actually finalized within mere days of other Defendants. (Blue Br. at 21–22.)

Contrary to Defendants' spin, staggered timing advances each Defendant's interests by making conspiracy less obvious. (Red Br. at 53–56.) Each Defendant made hundreds of millions of dollars in profits through the conspiracy—regardless of the start date. None "los[t] out on the alleged benefits." (*Id.* at 56.) That is how price-fixing works—competitors all win at the expense of their customers. Here, each Defendant was substantially richer because of their conspiracy,

22

regardless of whether they started slashing discounts in September, October, or January.

Moreover, other Defendants did not "cede" market share to Novo Nordisk by slashing discounts three or four months before Novo Nordisk did. (*Id.* at 52.) Market share changes slowly because patients do not see doctors about prescriptions every day. (JA-850, 866.) Several months was sufficiently close enough "to prevent covered entities from moving patients." (JA-866.) Because the price-fixing scheme here thus did not "quickly impose a negative toll on the first firm to raise its price," *Ross*, 35 F. Supp. 3d at 439 (quoted at Red Br. at 55–56), Defendants took little risk in staggering restraints—and gained mightily.

### 2. Defendants' conduct arguments depart from precedent and are too narrowly focused.

#### a. Defendants misread and ignore precedent.

Defendants misread *Twombly* to insist that conspirators must impose agreed-upon restraints in the same way to be parallel. They concede *Twombly* "alleged an array of anticompetitive conduct." (Red Br. at 53.) Yet they insist that the *Twombly* complaint "alleged that *all* the defendants engaged in *all* those activities." (*Id.*) That is not true.

23

The *Twombly* complaint listed a two-page menu of different activities used to thwart new market entrants. *See* Consol. Class Action Compl., at ¶47, *Bell Atl. Corp. v. Twombly*, 05-1126, Joint App'x, 2006 WL 2472651, at *24–25 (U.S.). It alleged each defendant undertook at least one or more of the acts from that menu. *See id.* ("Defendants . . . commit[ed] one or more of the following wrongful acts:"). It thus pled a hodge-podge of acts by defendants aimed at the same goal. Defendants there, as this Court aptly explained, "engaged in a variety of activities" "to keep [new firms] from entering" the market. *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 118 (2d Cir. 2005). It made no difference that defendants thwarted entrants in various ways, rather than one uniform way; the varied conduct with a shared aim (thwarting market entrants) was parallel conduct. (Blue Br. at 45–46.)

Accordingly, *Twombly* stands alongside the many precedents that Defendants nowhere challenge, which illustrate that restraints need not be imposed in the same way to constitute parallel conduct. (*Compare* Blue Br. at 48, *with* Red Br. at 52–56.) Airlines, for instance, act in parallel to lower capacity, even if they do not "cut or limit[] capacity in exactly the same way." *In re Domestic Airline Travel Antitrust Litig.*,

24

221 F. Supp. 3d 46, 69 (D.D.C. 2016). Manufacturers act in parallel to keep new technologies off the market, even if some refuse licensing, others engage in spurious licensing, and others sign never-implemented licenses. *See Black & Decker*, 801 F.3d at 427–29. In general, "[c]onspirators may aid the common venture via techniques and stratagems that are consistent and reinforcing but not entirely overlapping." *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 479 (S.D.N.Y. 2017).

Defendants rely on precedents, by contrast, nothing like this one. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505 (8th Cir. 2018), presented a timeline irreconcilable with conspiracy. Park Irmat claimed Express Scripts and CVS conspired to bar it from a mail-order network—but one month after Express Scripts barred it, CVS actually *invited* Park Irmat *into* its network. *Id.* at 516. Similarly, in *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011), defendants did not limit credit in parallel because they were in fact "choosing to decline, decrease, and even increase credit." *Park Irmat* and *Burtch* are a far cry from this case, where Defendants all rowed in the same direction—to slash discounts.

25

### b. Defendants miss the forest of slashed discounts for the trees of individualized exceptions.

Defendants concede the facts demonstrating parallel conduct. They admit that each of their restrictions ended "the overwhelming majority of Contract Pharmacy 340B Drug Discount sales to covered entities." (Red Br. at 45.)

But Defendants attempt to subdivide this uniform and wildly profitable outcome by focusing on variations in methods and in how large a windfall each Defendant netted. They continue to overstate the various exceptions, which, as they concede, did not hinder them from slashing the vast majority of 340B discounts. The opening brief debunked each such overstatement (Blue Br. at 18–21, 23, 29–30, 32–34), and the data speaks for itself (*id.* at 32). Defendants likewise misattribute meaning to meaningless profit gradations among Defendants. (Red Br. at 27.) But no precedent requires identical price-fixing profits.

Their attempt to declare winners and losers is futile. They first declare Novo Nordisk the great loser among the conspirators, claiming it "left close to 40 percent [36%] of its 340B sales in place" (*id.* at 48) in "such a bad deal" (*id.* at 63). Three lines later, they declare Novo

26

Nordisk the outsized winner, netting "half a billion dollars annually" more than the others. (*Id.* at 49 (citing *id.* at 42).)[7] The truth is that every Defendant won; that is the allure of price-fixing. As *amicus curiae* American Antitrust Institute notes, looking at how each Defendant slashed discounts, rather than what they achieved in parallel, misses the forest for the trees. (Green Br. at 8.)

### c. Defendants leveraged portfolio-wide gains using their joint chokehold on diabetes treatments.

Nor does it matter that Defendants also netted upsides from their conspiracy on a wide swath of drugs. (Red Br. at 47–48.) Their common control of diabetes treatments allowed them to neutralize the risks they would have faced from acting alone—exclusion and market share loss. They colluded to neutralize those risks, maximizing gains across their portfolios.

Leveraging collusion does not make it any less parallel.

---

[7] Novo Nordisk absolutely "affected these Plaintiffs" through its participation in conspiracy. (Red Br. at 17.) That is why a plaintiff "may recover from any member of the conspiracy," not just "the person to whom he has paid the illegal prices." *Nw. Oil Co. v. Socony-Vacuum Oil Co.*, 138 F.2d 967, 971 (7th Cir. 1943).

### 3. Defendants seek a roadmap for price-fixing.

Ultimately, Defendants cannot explain why horizontal competitors should get free rein to fix prices, so long as they each agree to do so in their own way. As the examples in the *amicus curiae* brief illustrate, the reality is "that cartel participants will try to hide their illegal conduct, including by varying the timing and manner in which they implement the agreement." (Green Br. at 15.) If variations were all it took to avoid an antitrust suit, would-be cartel members would have "a blueprint to avoid private enforcement." *Id.* That would be a dangerous precedent.

### D. Defendants fail to rebut each plus factor.

Parallel conduct here is paired with the entire set of unrebutted plus factors. *First*, as to pricing practices, Defendants clearly broke the status quo. *See supra* I.A.1. Their claim that it was a ten-year stable status quo but not a 28-year one is beside the point. (Red Br. at 60–61.) And whether or not Defendants' 340B restrictions were legal under the 340B statute makes no difference. (*Id.* at 61.) It is the collusion that is illegal. (Blue Br. at 75.)

*Second*, Defendants cannot show that imposing unilateral 340B contract pharmacy restrictions was aligned with their self-interest. The

28

complaint plausibly explains that any firm acting alone would face regulatory exclusion and market share loss. (*Id.* at 62–65.) *Third*, on the other side of the same coin, the ability to mitigate these risks gave Defendants a plausible motive to conspire. (*Id.* at 65–67.) On both points, Defendants offer no explanation for why no drug company dared impose their dramatic restraints for over ten years, until Defendants did so together. *See supra* I.A.1.

*Fourth*, Defendants mischaracterize their communications as limited to a mere "opportunity to conspire" via "participation in trade associations." (Red Br. at 58–60.) But time-specific lobbying records place Defendants in conversation about 340B discounting (JA-810–11 (¶¶124–27)) with the same lobbyists immediately in advance of their restrictions (JA-811 (¶127)). That juxtaposition suggests conspiracy. (Blue Br. at 67–68.) And, as Defendants concede, "any anticompetitive discussions at a lobbying meeting" would be admissible. (Red Br. at 60 n.4.)

*Fifth*, Defendants cannot brush off their complete domination of the lucrative diabetes markets that offered them a motive to conspire. While market concentration alone may be insufficient as a plus factor

29

(*Id.* at 64), it weighs in favor of plausibility where, as here, there is a plausible motive to conspire. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323–24 (2d Cir. 2010). The reason is simple: a group of just four is easy to organize into a conspiracy. (Blue Br. at 69.)

*Sixth* and finally, investigations into Defendants' price-fixing of the same diabetes treatments they leveraged to slash 340B discounts are fairly linked to this case. (Red Br. at 65.) Those investigations do not merely suggest that "if it happened [in Europe], it could have happened here." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (cited by Red Br. at 65–66). They concern the same decision-makers at the same companies at the same time. They reinforce that Defendants' oligopoly has been "anything but a free market." (JA-863.)

At the end of the day, alleged antitrust conspiracies must be regarded "as a whole, rather than piecemeal." *Anderson News*, 680 F.3d at 190. And a "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Twombly*, 550 U.S. at 556. The allegations here, taken as a whole, *at least* plausibly plead conspiracy.

30

**E.     This Court should remand all claims, federal and state.**

Defendants are wrong that Plaintiffs did not "appeal the district court's dismissal of their state-law antitrust and unjust enrichment claims." (Red Br. at 32.)  Plaintiffs appealed the judgment and the orders it encompassed, including denial of leave to amend the state law claims.  (JA-987–88.)  *See* Fed. R. App. P. 3(c)(4).  Plausibility was the sole ground for denial of leave as to both the federal and state claims (JA-985), and neither the court nor the parties drew any distinction between federal and state claims as to plausibility—as there is none.  (*Id.*; Pls.' Mem. at 13, Dkt. 72-3, 6:21-cv-06507 (W.D.N.Y. Oct. 3, 2022); Defs.' Opp'n Mem. at 23, Dkt. 74, 6:21-cv-06507 (W.D.N.Y. Oct. 27, 2022); Pls.' Reply at 1, Dkt. 75, 6:21-cv-06507 (W.D.N.Y. Nov. 3, 2022).)  Appellants extensively briefed plausibility (Blue Br. at 44–70), the only argument Plaintiffs needed to address in their opening brief.  *See Warmenhoven v. NetApp, Inc.*, 13 F.4th 717, 729 (9th Cir. 2021).

**POINT II**

**THE ANTITRUST LAWS APPLY TO DEFENDANTS' CONDUCT.**

**A.     *Astra* imposes no bar here.**

Defendants continue to erroneously claim this case is barred by the Supreme Court's holding in *Astra USA Inc. v. Santa Clara County*,

31

563 U.S. 110, 113 (2011), which found no private right of action to sue for violations of Section 340B. (Red Br. at 67–74.) Their "analogous" authorities likewise barred suits predicated on statutory violations that litigants lacked authority to enforce. *See Conboy v. AT&T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001) (barring suit predicated on state debt collection violations lacking private right of action); *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 636–38 (2d Cir. 1989) (barring RICO suit predicated on whistleblower violations confined to exclusive venue). (Red Br. at 70.)

But this suit is not predicated on a 340B violation. The complaint alleges no 340B violation and is "agnostic as to that question" (JA-900), as Defendants nowhere contest. Plaintiffs' suit is instead predicated entirely on "the supreme evil of antitrust: collusion." *Verizon Commc'ns Inc. v. Law Office of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). And the antitrust remedies sought would enjoin that collusion, not codify an interpretation of 340B, as Defendants cannot contest. (*Compare* Blue Br. at 76–77, *with* Red Br. at 73.) This is commonplace: Antitrust laws prevent collusion to restrain trade even when doing so

breaks no other law. (Blue Br. at 74–75.) It's the agreement that's illegal *per se*. That's Antitrust 101.

## B. Defendants' belated immunity defense lacks merit.

Because *Astra* cannot bar this suit, Defendants now argue instead for immunity from antitrust suit under *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007). (Red Br. at 69, 72–73.) But they never argued *Billing*, implied immunity, implied preclusion, or implicit repeal below, so this argument is waived.[8] *See In re Anderson*, 884 F.3d 382, 388 (2d Cir. 2018).

In any event, Defendants' *Billing* argument lacks merit. *Billing*— which this Court has never applied outside the securities context—is about "whether securities law precludes antitrust laws." 551 U.S. at 275; *accord Elec. Trading Grp., LLC v. Bank of Am. Secs. LLC*, 588 F.3d 128, 131–32 (2d Cir. 2009). Such "implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy." *United States v. NASD*, 422 U.S. 694, 719 (1975). It is

---

[8] *See* Defs.' Mot. to Dismiss, Dkt. 47, 6:21-cv-06507 (W.D.N.Y. Nov. 12, 2021); Pls.' Opp'n Mem. at 38 n.17, Dkt. 58, 6:21-cv-06507 (W.D.N.Y. Jan. 7, 2022); Defs.' Reply, Dkt. 66, 6:21-cv-06507 (W.D.N.Y. Feb. 04, 2022); Defs.' Opp'n Mem., Dkt. 74, 6:21-cv-06507 (W.D.N.Y. Oct. 27, 2022).

not a defense every time a restraint is the subject of legislation. *See, e.g., Otter Tail Power Co. v. United States*, 410 U.S. 366, 373–74 (1973); *Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 27, 29–31 (2d Cir. 1985).

In *Billing* and related cases, courts encountered securities laws that *permitted* joint action. *See Billing*, 551 U.S. at 276 (syndicate formation "at the very heart of the securities marketing enterprise"); *NASD*, 422 U.S. at 722–28 (mutual fund resale restraints needed "to deal with the disruptive effects of 'bootleg market'"); *Gordon v. NYSE*, 422 U.S. 659, 682–90 (1975) (commission rulemakings by NYSE competitor-members); *Elec. Trading Grp.*, 588 F.3d at 137–38 (broker communications to facilitate short-sales). Irreconcilable conflict could arise because joint action was encouraged by securities laws yet prohibited by antitrust laws. *See Billing*, 551 U.S. at 275.

No such conflict exists here. The 340B statute contemplates no joint action by drugmakers whatsoever. Applying antitrust scrutiny to collusion between them thus creates no risk of confusing what "'is forbidden from what is allowed.'" *Elec. Trading Grp.*, 558 F.3d at 137 (quoting *Billing*, 551 U.S. at 280). Because Defendants have no "lawful reason to engage in the collusive conduct alleged," *Hinds Cnty. v.*

34

*Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 405 (S.D.N.Y. 2010), and

"need not form a joint enterprise," there is no "unusually serious line-

drawing problem" justifying repeal of the antitrust laws, *In re W. States*

*Wholesale Nat'l Gas Antitrust Litig.*, 661 F. Supp. 2d 1172, 1181–82 (D.

Nev. 2009).  Section 340B does not preclude antitrust law.

**POINT III**

***ILLINOIS BRICK* PROVIDES NO ALTERNATIVE FOR AFFIRMANCE.**

**A.    There is no reason to reach this question on appeal.**

There is no reason to reach *Illinois Brick Co. v. Illinois*, 431 U.S.

720 (1977), before the district court does, as this Court's "distinctly

preferred practice [is] to remand such issues for consideration by the

district court in the first instance."  *Schonfeld v. Hillard*, 218 F.3d 164,

184 (2d Cir. 2000).  Even so, *Illinois Brick* governs federal damages

remedies only—not damages under the thirty state laws pled (JA-873–

90 (¶¶381–480)), see *Supreme Auto Transp., LLC v. Arcelor Mittal USA,*

*Inc.*, 902 F.3d 735, 743–44 (7th Cir. 2018), and not injunctive relief (JA-

873 (¶380), JA-891), *see McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842,

856 (3d Cir. 1996).  It cannot resolve this appeal and would minimally

impact the scope of a remand.

35

**B.** *Illinois Brick* **does not apply to losses that Defendants admit are not overcharges.**

And *Illinois Brick* is irrelevant. *Illinois Brick* "is a rule concerning overcharges," *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 606 (7th Cir. 1997), which serves "to eliminate the complications of apportioning overcharges between direct and indirect purchasers," *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 208 (1990).

But Plaintiffs' federal claim does not seek overcharge damages, unlike plaintiffs in each "analogous" case Defendants cite (Red Br. at 75–76), including *Howard Hess Dental Labs., Inc. v. Dentsply International, Inc.*, 424 F.3d 363, 373–76 (3d Cir. 2005), where plaintiffs complained of "behavior [that] caused prices to increase." As Defendants admit, their restrictions typically ensure "no sale" to Plaintiffs, so covered entities cannot be "overcharged." (JA-818–21 (¶¶146–53).) Defendants concede that their "refusal to transfer drugs to contract pharmacies does not result in a charge to covered entities, let alone an overcharge." (JA-749; *accord* JA-584, 609–12, 628, 669–72, 679–89.) Thus, "most often, covered entities have not purchased drugs for dispensing at Contract Pharmacies because of their lost access." (JA-867 (¶353).) Plaintiffs' federal claim seeks damages only for

36

revenue losses resulting from such lost access, deemed "lost 340B Savings Revenue."[9]  (*Id.*)

Illinois Brick does not preclude damages here because there is "not the slightest possibility of a duplicative exaction." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 475 (1982).  Plaintiffs' *foreclosure* from purchasing drugs at community pharmacies, "unlike an overcharge claim, does not involve a purchase." *Drug Mart Pharm. Corp. v. Am. Home Prods. Corp.*, 93-cv-5148, 2002 WL 31528625, at *7 (E.D.N.Y. Aug. 21, 2002).  As Judge Posner explained, where manufacturers stop sales to plaintiffs, "the *Illinois Brick* rule . . . fall[s] away" as there is no attempt "to recover overcharges." *In re Brand Name Prescription Drugs*, 123 F.3d at 606.  That is this case.

---

[9] Plaintiffs seek overcharge damages for actual sales (*e.g.*, in error) only in states where *Illinois Brick* does not apply.  (JA-873–90 (¶¶351–53, 381–480).)

## CONCLUSION

**The judgment of the district court should be reversed.**

Dated:     Rochester, New York
           September 30, 2024

                                    Respectfully submitted,

                                    /s/ Brian Marc Feldman

                                    BRIAN MARC FELDMAN
                                    SHEILA BAYNES
                                    AURELIAN LAW PLLC

                                    ELLEN MERIWETHER
                                    CAFFERY CLOBES MERIWETHER &
                                    SPRENGEL LLP

                                    LAUREN MENDOLERA
                                    HARTER SECREST & EMERY LLP

                                    *Attorneys for Plaintiffs-*
                                    *Appellants*

38

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) and Local Rule 32.1(a)(4).  As measured by the word processing system used to prepare this brief, there are 7,000 words in this brief.

By:   BRIAN MARC FELDMAN
      AURELIAN LAW PLLC